Manuel A. Borinstein and Pearl A. Borinstein v. Commissioner.
Borinstein v. Commissioner
Docket Nos. 4830-67, 4891-67.
United States Tax Court
T.C. Memo 1972-150; 1972 Tax Ct. Memo LEXIS 107; 31 T.C.M. (CCH) 743; T.C.M. (RIA) 72150; July 11, 1972
Gilbert Dreyfuss and Douglas W. Argue, 615S. Flower, Los Angeles, Calif., for the petitioners. Sheldon M. Sisson, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax as follows: Year
Deficiency
1958
$ 298.65
1959
70,536.27
1960
249,469.21
1961
$120,604.01
1962
238,996.26
1963
229,380.40
1964
136.97
Certain issues having been settled *108 by stipulation of the parties, the only issue remaining for decision is whether a note, executed 744 by petitioners as co-partners of a general partnership in favor of the seller of a building, was contingent and illusory so that the amount of such note may not properly be considered a part of the cost of the building for purposes of determining the partnership's basis therein and the partnership may not properly accrue the interest thereon. Findings of Fact Some of the facts have been stipulated and the stipulations, together with the exhibits attached thereto, are incorporated herein by this reference. Manuel A. and Pearl A. Borinstein, husband and wife, filed joint Federal income tax returns for the taxable years 1958 through 1960 with the district director of internal revenue, Detroit, Michigan, and for the taxable years 1961 through 1964 with the district director of internal revenue, Los Angeles, California. During such years they kept their books and records and filed their returns on the cash receipts and disbursements method. At the time they filed their petition they resided in Los Angeles, California. For purposes of convenience, Manuel A. Borinstein will hereinafter *109 be referred to as the petitioner. The petitioner began his varied business career in the scrap metal business. In this business he focused his attentions on tin, which was then used extensively in the construction of electrical motors as a solder component. Although petitioner's formal education was limited to 2 years of high school, his industry and ingenuity, together with his emphasis on electrical concerns in the course of his scrap metal business, enabled him to acquire a sound knowledge of electrical motors and their uses. Subsequently he developed the largest electrical motor distributorship in the midwest and the third largest electrical fan manufacturer in the country. Both of these enterprises were based in Detroit, Michigan. Petitioner's knowledge of electrical systems led him to the real estate business where such knowledge was particularly adaptable to the rehabilitation and renovation of commercial buildings. Thereafter, he devoted a substantial portion of his time to projects wherein he would purchase an older building, rehabilitate it, and then resell it. Following this format, he profitably rehabilitated substantial commercial properties in Detroit, Michigan, Philadelphia, *110 Pennsylvania, and Wichita, Kansas. In the early part of 1959, petitioner was in Los Angeles with regard to the acquisition of interests in the Beverly Hills Hotel and in 300 acres of land located in the Palos Verdes Peninsula. During this time he met Harvey Silbert, an attorney in Los Angeles who represented Starrett Corporation, hereinafter referred to as Starrett. This corporation, wholly unrelated to petitioner, was controlled by Lou Halper. Starrett was then involved in developing a major shopping center known as La Mirada, which was located about 25 miles from downtown Los Angeles near La Habre and Santa Fe Springs. It hoped to induce Orbach's, a large department store in downtown Los Angeles, to move to La Mirada to serve as an anchor tenant. While Orbach's desired to move into the shopping center, it felt that it had to dispose of its downtown store building in order to provide it with sufficient working capital to expand and with the necessary personnel to staff the new location. In order to accomplish these objectives, it was contemplated that Starrett would purchase Orbach's store building; that Orbach's (through its controlled subsidiary Milliron's, which formally owned *111 the building) would sell the building for about $2,800,000 - a price which approximated the building's book value, but which was lower than its market value; and that Starrett, in consideration of such lower purchase price, would provide Orbach's with a lower rental structure at La Mirada, as well as additional fixtures for the space it was to occupy - benefits the value of which was about $1,000,000. On May 20, 1959, Starrett agreed to purchase Orbach's store building from Milliron's for about $2,800,000. In the parties' agreement the purchase price was to consist of $590,000 in cash, the assumption by Starrett of Milliron's obligations under a deed of trust on the property in favor of Prudential Life Insurance Company (then apparently in the principal amount of about $615,000), the assumption by Starrett of an indebtedness due from Milliron's to the Union Bank, and Starrett's promissory note for the balance. Starrett did not have sufficient funds to both acquire Orbach's store building and to complete the development of La Mirada. After meeting petitioner, Starrett's attorney inquired as to whether petitioner might be interested in acquiring an interest in the building together *112 with Starrett. 745 Orbach's store building, hereinafter referred to as the Fifth & Broadway Building, was located in the center of downtown Los Angeles with frontage of 160' on Fifth Street and 166' on Broadway. It was built in 1924 of reinforced concrete (class "A" construction) with brick facing and consisted of 12 floors, plus a full basement. In 1959, eleven floors were air-conditioned; escalators ran from the basement to the fourth floor; there were 7 modern passenger elevators and 2 freight elevators; and the entire building was sprinklered. The annual rental with respect to the ground leases of the property was about $70,000, and annual property taxes were about $97,000. After studying the building and its potential uses for several days, the petitioner determined that it was well suited to conversion to a modern office building. It was his opinion, based upon his experience, that such a conversion would cost about $800,000. In June 1959, after petitioner had discussed his plans for renovating the building with Starrett, he and Starrett tentatively agreed to form an equal partnership to purchase and renovate it. A draft of the partnership agreement contemplated that *113 the building would be purchased by the partnership for about $2,800,000 and that petitioner would thereafter provide the $800,000 necessary for its renovation. It was understood that as a partner petitioner would devote his time and efforts to renovating the building. On July 15, 1959, petitioner borrowed $1,200,000 from the Union Bank of Los Angeles, Starrett's banking connection, pledging his personally owned stock as security. Such loan was payable in 90 days and carried interest at 5 1/2%. On the same day petitioner loaned Starrett $1,150,000. These loan proceeds were deposited by Starrett in the escrow between it and Milliron's for payment to Milliron's for the purchase of the Fifth & Broadway Building. This loan was evidenced by Starrett's promissory note and was secured by a second deed of trust on the Fifth & Broadway Building. Its note was payable on October 10, 1959, and carried interest at 6%. At this time petitioner fully expected to be a co-owner of the Fifth & Broadway Building with Starrett. After acquiring the Fifth & Broadway Building Starrett began renovating it and also began leasing the vacated and renovated space therein. Sometime subsequent to July 15, 1959, the *114 tentative partnership agreement between petitioner and Starrett was submitted to Starrett's board of directors for approval. The board of directors did not approve the agreement and the petitioner was told that Starrett was unwilling to let him acquire co-ownership in the Fifth & Broadway Building on the basis of the $2,800,000 purchase price agreed to between Starrett and Milliron's because he was not contributing to the benefits Starrett had agreed to provide Orbach's at La Mirada. Thereafter petitioner negotiated to purchase the building from Starrett. Ultimately Starrett agreed to sell the Fifth & Broadway Building to petitioner for $4,000,000, such figure representing the price at which the building had been purchased from Milliron's - about $2,800,000, the expenses Starrett had incurred in its renovation - $200,000, and the value of the benefits Starrett was to provide Orbach's at La Mirada - $1,000,000. In October 1959, the Michigan Investment Company, hereinafter referred to as MIC, a general partnership consisting of petitioner and his wife, was formally organized for the purpose of owning the Fifth & Broadway Building. For its taxable years 1959 through 1964 it kept its *115 books and records and filed its Federal partnership income tax returns on the accrual method of accounting. By a series of agreements, which provided that they were entered into as of October 1, 1959, MIC purchased the Fifth & Broadway Building from Starrett. Contemporaneously, Starrett, through a wholly-owned subsidiary known as Meyenberg-Old Fashion Products Co., leased the building back from MIC pursuant to a master lease agreement described hereinafter. The agreement between MIC and Starrett with respect to the purchase and sale of the Fifth & Broadway Building provided in part as follows: 2. Purchase Price. (a) The purchase price which Buyer agrees to pay and Seller agrees to accept in full payment for the right, title and interest of Seller in the Building, is the sum of Four Million Dollars ($4,000,000). The purchase price shall be payable as follows: (i) One Million One Hundred Fifty Thousand Dollars ($1,150,000) through escrow, hereinafter described, upon closing. 746 (ii) A sum equal to the balance outstanding as of the closing of escrow upon that certain obligation owed by Seller under that certain note secured by deed of trust dated July 16, 1947, in which *116 Milliron's is trustor and Prudential Insurance Company of America is payee in the original principal sum of One Million Dollars ($1,000,000). (iii) The balance by Buyer's execution and delivery to Seller through escrow on closing, of a promissory note and deed of trust, substantially in conformance with Exhibits "B-1" and "B-2", respectively, attached hereto and made a part hereof. (b) As consideration for the transfer and assignment by Seller to Buyer of all of Seller's right, title and interest in the Ground Leases, Buyer agrees to, and does hereby, assume all of the obligations, liabilities and responsibilities of lessee under the Ground Leases commencing upon the date of closing. As executed, the promissory note hereinabove referred to in paragraph 2(a)(iii) of the parties' agreement was as follows: $2,266,662.47 October 1, 1959 FOR VALUE RECEIVED, MICHIGAN INVESTMENT Co., a general partnership consisting of MANUEL A. BORINSTEIN and PEARL A. BORINSTEIN, 2103 First National Building, Detroit 26, Michigan, promise to pay to STARRETT CORPORATION, a Delaware Corporation, or order, at 739 North Highland Avenue, Los Angeles, 38, California, the sum of Two Million Two Hundred *117 Sixty-six Thousand Six Hundred Sixty-two Dollars and Forty-seven Cents ($2,266,662.47), together with interest on the unpaid portion thereof from date until paid at the rate of seven percent (7%) per annum, both principal and interest payable in lawful money of the United States, in installments, and at the times hereinafter stated, to-wit: (1) $2,000.00 on the 25th day of January, 1960; $2,000.00 on the 25th day of April, 1960; $2,000.00 on the 25th day of July, 1960; $2,000.00 on the 25th day of October, 1960; $2,000.00 on the 25th day of January, 1961; $2,000.00 on the 25th day of April, 1961; $2,000.00 on the 25th day of July, 1961; $4,500.00 on the 25th day of October, 1961. (2) Thereafter, beginning on January 25, 1962, the sum of $54,500.00 quarterly (i.e., on the 25th day of January, April, July, and October) and on each quarter thereafter until March 2, 1966, when all sums due shall be paid in full. Payments made shall be applied first against payment of interest and thereafter against principal until all principal and interest are paid in full. The sole remedy of payee or order under this Note in the event of default shall be against the Deed of Trust given as security *118 therefor only and there shall be no personal liability thereunder and no deficiency shall be taken under said Deed of Trust against the maker, or any successor or assignee of maker. If action be instituted on this Note, we promise to pay such sum as the Court may fix as attorney's fees. This Note is secured by a Deed of Trust bearing even date herewith and is subject to a Supplemental Provision to Deed of Trust by maker and payee as of October 1, 1959. MICHIGAN INVESTMENT Co. BY Manuel A. Borinstein BY Pearl A. Borinstein The deed of trust executed by MIC provided that it was subject to the deed of trust in favor of Prudential Life Insurance Company, the provisions of the parties' agreement of purchase and sale, the master lease to Meyenberg-Old Fashion Products Co., and certain supplemental provisions to the deed of trust. Such supplemental provisions provided in part as follows: SUPPLEMENTAL PROVISIONS TO DEED OF TRUST THESE SUPPLEMENTAL PROVISIONS TO DEED OF TRUST are made as of the 1st day of October, 1959, by and between STARRETT CORPORATION, a Delaware Corporation, hereinafter called "Beneficiary", and MICHIGAN INVESTMENT Co., a General Partnership composed of *119 MANUEL A. BORINSTEIN and PEARL A. BORINSTEIN, hereafter called "Trustor", which provisions are supplemental to the provisions contained in that certain deed of trust dated October 1, 1959 executed by Trustor to Title Insurance and Trust Company, a California corporation, trustee, in favor of Beneficiary, which deed of trust is hereinafter called "Beneficiary's Deed of Trust". RECITALS: A. Beneficiary has this day sold to Trustor, and Trustor has purchased from Beneficiary, that certain building, hereinafter called "the Building," and Beneficiary has assigned to Trustor, all of Beneficiary's right, title and interest as lessee under those certain ground leases, 747 hereinafter called "the Ground Leases," which Building and Ground Leases are more particularly described in Beneficiary's Deed of Trust. B. In connection therewith, and as part of the purchase price, Trustor has executed and delivered to Beneficiary a promissory note, hereinafter called "Beneficiary's Note," secured by Beneficiary's Deed of Trust, which deed of trust is subordinate to a present first deed of trust in favor of Prudential Life Insurance Company of America. C. It is anticipated that Trustor will *120 refinance the indebtedness existing against the Building and the Ground Leases on an interim basis or permanent basis, or both, and that such financing will be secured by the Ground Leases and the Building, and/or other security. D. This agreement is being executed to delineate the priorities of the various loan securities, and to provide for the distribution of the proceeds of new financing, and the adjustment of the payments due under Beneficiary's Note. NOW, THEREFORE, it is mutually agreed: ARTICLE I INTERIM FINANCING In the event Trustor obtains an interim loan, and provided that Trustor has performed all of the terms and conditions hereof: 1. Beneficiary will, on demand, execute such documents as are required to assure that: (a) A note evidencing such interim loan, or any extensions, renewals, or replacements thereof, shall have security rights in the Building and the Ground Leases prior and superior to the lien of Beneficiary's Deed of Trust. The priority of the security of the interim loan, over and above the lien of Beneficiary's Deed of Trust, may be evidenced by a deed of trust in favor of the interim lender or may be in any other form acceptable to the interim *121 lender and Trustor. (b) Beneficiary's Note and Beneficiary's Deed of Trust are subject to: (i) That certain lease by and between Trustor, as lessor, and Meyenberg-Old Fashion Products Company, a California corporation, as lessee, which lease is hereafter called "Master Lease," the term of which commences October 1, 1959. (ii) The subleases now in existence. (iii) Any subleases hereafter created by the lessee under the Master Lease. (c) The due date of any and all payments due on Beneficiary's Note shall be extended until the happening of the earlier of the following dates: (i) The due date of the interim loan as extended, renewed, or replaced; (ii) Sixty (60) months from the date hereof. During such period, Beneficiary will permit all sums due under Beneficiary's Note to accrue. Upon the happening of the earlier of the foregoing dates, all sums of principal and interest which would have theretofore been due and payable but for the provisions of this subparagraph, shall then immediately become due and payable. 2. Such interim loan shall be in the sum of no less than Two Million Dollars ($2,000,000); the interest thereon shall not exceed the going interest rate at the *122 time the loan is made, or extended, renewed, or replaced; payments of interest and principal shall not exceed the amount receivable by Trustor under the Master Lease, less the rentals payable to the lessors under the Ground Leases; the term of said loan shall not be more than sixty (60) months from the date hereof, including extensions, renewals and replacements; the term of the initial interim loan shall not be less than one (1) year; and Trustor or Beneficiary shall have the option to pay upon the principal of said loan without penalty at any time. 3. The proceeds of said interim loan, when paid to Trustor, are to be applied in the following priorities: (a) To pay the loan fee and/or costs of obtaining the loan, including escrow charges in connection therewith, title policy fees and other similar matters. (b) To pay or set aside for payment from time to time at the option of the interim lender and/or Trustor, all or any portion of the sums owed on principal, interest or penalties for prepayment or otherwise, to Prudential Life Insurance Company of America under a note and deed of trust dated July 16, 1947, in which Milliron's is maker and trustor, and Prudential is payee and *123 beneficiary, and which was in the original principal amount of One Million Dollars ($1,000,000). (c) To be retained by Trustor, the sum of One Million One Hundred Fifty Thousand Dollars ($1,150,000). (d) To pay all remaining proceeds of said loan to Beneficiary, to be applied upon Beneficiary's Note against the last payments of principal payable thereon. * * * ARTICLE II PERMANENT FINANCING * * * 2. The principal amount of such new permanent financing shall not be less than the sum of Two Million Dollars ($2,000,000). 748 The interest rate thereof shall not exceed the general going market rate for such a loan, and principal and interest shall be payable in monthly or quarterly installments, not necessarily equal, over a period of not less than fifteen (15) years, and such loan shall be without personal liability to Trustor. 3. Beneficiary shall have the right to make available permanent financing upon the Building and the Ground Leases at any time prior to the placement of the permanent financing by Trustor, upon sixty (60) days' notice, in writing, to Trustor, provided that the financing made available by Beneficiary meets the terms set forth in Paragraph 2 of this *124 ARTICLE II.: 4. Beneficiary shall further have the right at any time after April 2, 1962, provided that all terms and conditions of the Master Lease upon the premises have been met in full and performed by the lessee thereunder during the term of this agreement, and said lessee shall not be in default thereunder as of that date, upon sixty (60) days' prior written notice to Trustor, to make available new financing upon the Building and the Ground Leases, which new financing shall be in such principal amount and be repayable on such terms as Beneficiary, in the sole discretion of Beneficiary, may make available; provided that the total payments required to be made by Trustor on such new financing, plus the installment payments of principal and interest required to be paid on Beneficiary's Note, shall not exceed Four Hundred Twenty-five Thousand Dollars ($425,000) per annum, in equal monthly or quarterly installments; provided further than the interest rate thereon shall not exceed the general going market rate for such loans, and provided further than such new financing repays in full any interim loan or permanent financing then existing upon the property, plus costs and charges and *125 penalties, and provided further that such new financing is without personal liability to Trustor. Trustor shall be obligated to accept such financing and to execute any and all documents required to effect the new financing on such terms. In September 1959, a projection of the estimated income and expenses of the Fifth & Broadway Building, after modernization, had been prepared for the use of Starrett's board of directors. Such projection was as follows: 749 * State of California maintains its own space. Following is a breakdown of the current maintenance expenses: Janitorial & Maintenance Employees
$36,000.00
Elevator Service & Maintenance
15,000.00
Trash Disposal
600.00
Utilities
18,900.00
Fuel Oil
3,000.00
Supplies
3,500.00
Miscellaneous Maintenance 3,600.00
$80,600.00
** J.C. Penney wants to expand an additional 18,000 sq. ft. after having only been in their present space for three months. Within the next week we should have a decision on this matter. Negotiations are also pending with the FHA for a full floor and with the UCLA Ext. service for approximately 40,000 sq. ft. *** Negotiations with W. T. Grant have progressed rapidly. *126 They feel they can do no less than $6-1/2 million in this space which is about double the size of J. J. Newberry directly across the street and much more desirable area. The above quoted $6-1/2 million is what J. J. Newberry is presently doing. As indicated hereinabove, contemporaneously with the sale of the Fifth § Broadway Building to MIC, Starrett through its controlled subsidiary, Meyenberg-Old Fashion Products Co., leased the building back. This subsidiary, hereinafter referred to as Meyenberg, was a profitable and financially sound enterprise engaged primarily in processing various dairy products and in franchising frozen dairy products. The master lease agreement between MIC and Meyenberg required the latter to pay annual rent of $495,000, as well as property taxes and insurance costs with respect to the Fifth & Broadway Building. The lease term was for 15 years and Meyenberg had an option to cancel the lease at the end of 6 1/2 years upon paying a penalty equal to 15 months' rent. On or about October 8, 1959, La Mirada Business Properties, Inc., the wholly owned subsidiary of Starrett to which the La Mirada shopping center had been transferred, formally guaranteed Meyenberg's *127 obligations under the master lease. In a report to its shareholders dated November 6, 1959, Starrett disclosed the following with respect to the lease of the Fifth & Broadway Building: Meyenberg-Old Fashion Products Company, a wholly owned subsidiary of Starrett, holds a Master Lease on the building as Lessee, at a rental of $495,000.00 per year, plus taxes and insurance. The lease term is fifteen (15) years; the lease is cancelable at the option of Meyenberg-Old Fashion Products Company at the end of six and one-half (6 1/2) years, with penalty. It is anticipated that the present sub-tenant leases on the building, plus those under negotiation will provide a profit to Meyenberg-Old Fashion Products Company on the Master Lease. Neither Starrett nor any of its subsidiaries was given an option to repurchase the Fifth & Broadway Building. MIC financed the acquisition of the Fifth & Broadway Building in the following manner: it obtained a financing commitment in the amount of $2,000,000 from the Bank of America; [1] it borrowed $1,490,000 pursuant to such commitment, $1,200,000 of which was used to repay petitioner's loan from the Union Bank; the remaining $250,000 was transferred *128 to Starrett to be used in renovating the Fifth & Broadway Building. Such latter amount was credited against the principal amount of the promissory note which was given by MIC to Starrett on the purchase of the Fifth & Broadway Building. Such latter amount was credited against 750 the principal amount of the promissory note which was given by MIC to Starrett on the purchase of the Fifth & Broadway Building. The master lease arrangement between MIC and Meyenberg was transferred to the Bank of America and the rental payments derived therefrom were applied against, and ultimately satisfied, the $1,490,000 indebtedness which MIC had incurred. *129 In accordance with the terms of the agreement of purchase and sale between Starrett and MIC the $4,000,000 purchase price for the Fifth & Broadway Building was paid as follows: Form of
Consideration
Consideration
Explanation
$ 250,000.00
Cash.
A portion of funds borrowed by MIC from the Bank of America.
$ 583,337.53
Assumption of obligations under Prudential Note and Deed of Trust.
This amount represented the balance due Prudential Insurance Company as holder of the first Deed of Trust on the Fifth & Broadway Building.
,1,150,000.00
Cancellation of debt aris-ing from cash loan to Starrett.
This is the indebtedness which arose on July 15, 1959 when petitioner loaned Starrett the funds with which to close the purchase of the Fifth & Broadway Building from Milliron's.
$2,016,662.47
Promissory Note.
This is the balance due on MIC's promissory note after reduction by $250,000 for cash paid to Starrett.
$4,000,000.00 - TOTAL
From October 1, 1959 to December 31, 1959, Meyenberg leased and operated the Fifth & Broadway Building pursuant to its obligations under the master lease agreement. On or about December 31, 1959, Meyenberg assigned the master *130 lease and tent leases to La Mirada Business Properties, Inc., hereinafter referred to as LMBP. At the same time Starrett assigned to LMBP the promissory note and deed of trust which MIC had executed on the purchase of the Fifth & Broadway Building. In March 1960, Starrett and Food Giant Markets, Inc., a corporation wholly unrelated to either the petitioners or Starrett, agreed to form Pacific Coast Properties as a real estate operating and development corporation. In May 1960 Starrett contributed the stock of LMBP to Pacific Coast Properties in exchange for the latter's stock. Thus, Pacific Coast Properties and its new subsidiary, LMBP, succeeded to the obligations under the master lease agreement between MIC and Meyenberg, as well as to the promissory note and deed of trust which had been executed by MIC on the purchase of the Fifth & Broadway Building. In September 1961, Starrett sold all of its stock in Pacific Coast Properties. After October 1959, Meyenberg and its successor-lessee, LMBP, failed to complete the renovation of the Fifth & Broadway Building. Substantial annual losses were incurred by LMBP as lessee during the succeeding years. In 1963 representatives of Pacific *131 Coast Properties, LMBP's parent corporation, contacted petitioner in an attempt to find a way to limit or eliminate such losses. Petitioner was of the opinion that the master lease agreement could still be profitable for a lessee if the Fifth & Broadway Building were renovated as originally contemplated. In order to provide LMBP with sufficient cash to complete the renovation of the building, MIC agreed to a $10,000 reduction in the monthly rental and also agreed to make monthly interest payments of $11,763.86 on its note. Up to this time, pursuant to the supplemental provisions to the deed of trust, MIC had deferred payments of principal and interest on the note it had executed on the purchase of the Fifth & Broadway Building. To assure that LMBP would utilize such funds to make improvements to the building, MIC required that it give up its option to cancel the lease prior to the expiration of the 15-year lease term. However, since its subsidiary was to improve the building, Pacific Coast Properties required that it be given an option to purchase the building. These requirements were agreed to by the parties in July 1963, and at that time the master lease agreement was modified, MIC *132 began making monthly interest payments on its note, and Pacific Coast Properties was given an option to purchase the Fifth & Broadway Building for the price of $4,375,000. The provisions with respect to such option price contemplated that Pacific Coast Properties would assume 751 MIC's obligations under the deed of trust in favor of Prudential Life Insurance Company that MIC's promissory note would be applied against the option price at its face amount; and that the balance of the option price would be paid to MIC in cash. Concurrently with the payment of the option price, MIC was to pay the accrued but unpaid interest on its note. As of June 30, 1963, such interest was in the amount of $529,373.88. During each of the months July through December 1963, MIC made payments of interest on its note in the amount of $11,736.86. On December 30, 1963, the petitioners loaned $530,000 to MIC. By check dated December 31, 1963, MIC paid the accrued but previously unpaid interest on its note, namely, $529,373.88, to Pacific Coast Properties. On January 14, 1964, MIC formally was advised by letter that LMBP was exercising the option to purchase the Fifth & Broadway Building. On January 18, 1964, an *133 escrow was opened at the Union Bank for the purchase of the Fifth & Broadway Building by LMBP. On January 31, 1964, such escrow was closed. The balance on the Prudential deed of trust at that time was about $325,000. At that time MIC received a check in settlement of the purchase price in the amount of $2,028,842.71. On its return for the taxable year 1964, MIC reported the sale of the Fifth & Broadway Building as follows: Acquired October 1, 1959 Sold January 31, 1964 Gross Selling Price
$4,375,000
Basis
$4,008,324
Less Depreciation 1,637,569
Adjusted Basis 2,370,755
Section 1231 Gain $2,004,245 In its returns for the taxable years 1959 through 1964, MIC reported the following: 1959
1960
1961
1962
1963
1964
Rental Income
$ 98,250
$495,000
$495,000
$495,000
$430,500
$30,500
Interest Income
41,007
Ground Rent
17,500
70,000
70,000
70,000
70,000
5,833
Interest
59,208
248,921
250,295
247,864
187,740
12,846
Repairs
297
Depreciation
128,705
492,255
402,470
334,170
280,970
Miscellaneous
2,911
125
385
3,042
36
Total Expense $205,413
$813,384
$722,890
$652,419
$541,752
$18,715
Net (Loss) Gain ($107,163)
($318,384)
($227,890)
($157,419)
($111,252)
$52,792
*134 The depreciation reported by MIC on the Fifth & Broadway Building was calculated on an original basis of $4,003,750. In the notice of deficiency the respondent determined that MIC's original basis in the Fifth & Broadway Building was $1,986,887.53, consisting of the cash which was paid to Starrett, $250,000, the loan which was made to Starrett, $1,150,000, the Prudential Mortgage assumed by MIC, $583,337.53, and legal fees of $3,550. He thus eliminated from the claimed original basis MIC's note in the amount of $2,016,662.47. He therefore disallowed portions of the claimed depreciation deductions. He also disallowed deductions claimed on account of interest accrued on such note. Opinion The issue for decision is whether the promissory note given by MIC, a partnership of which petitioners were equal partners, to Starrett on the purchase of the Fifth & Broadway Building was, as contended by the respondent, contingent and illusory so that the amount of such note did not constitute a part of the cost of the building, and MIC was not entitled to depreciation deductions calculated on a basis in the building which included such note, 752 and was not entitled to deductions with *135 respect to the interest accrued on such note. [2]
*136 We have carefully considered the entire record in this case and have set forth in some detail in the Findings of Fact the various circumstances surrounding the transaction in question. At the outset it should be noted that the record clearly establishes that the parties to the transaction were unrelated and dealt at arms' length. Indeed, the respondent does not question the bona fides of the transaction or of the note itself. Rather, it is his position that certain provisions contained in supplemental provisions to the deed of trust which was given by MIC to secure its note contained conditions which were impossible to meet, and that, therefore, the note and MIC's obligations thereunder were contingent and illusory. The provisions to which the respondent specifically refers are those which delay MIC's obligation to make payments of principal and interest on the note. As set out in our Findings, such provisions permitted the deferral of both principal and interest payments until the earlier of two dates: the due date of any interim loan obtained by MIC in conformity with certain provisions relating to interim financing contained in the supplemental provisions, or the date 60 months *137 from the date of the note. On brief the respondent attempts to demonstrate that the provisions with respect to interim financing were impossible to meet. Such provisions were to the effect that the amount of any interim loan could not be less than $2,000,000; that the interest with respect to any such loan could not exceed the market rate at the time the loan was made; that the term of any such loan could not exceed 60 months from the date of the note; and that payments of principal and interest with respect to any such loan could not exceed the net amount receivable by MIC under its master lease agreement with Meyenberg, namely, $425,000 annually. His calculations on brief were as follows: $2,000,000 5 years
$400,000
Interest at 6% on $2,000,000 120,000
Annual Payment
$520,000
Interim Financing Ceiling
425,000
However, as pointed out by petitioner, the respondent's calculations are based on the assumption that the minimum principal amount of any interim financing, $2,000,000, would have to be completely amortized within the maximum loan term, 60 months. In our opinion such an assumption is not warranted either by the language of the supplemental provisions *138 or by common business practice with respect to short-term real estate financing. Further, it seems apparent that the interim financing ceiling referred to above by respondent, namely, the $425,000 net annual payment receivable by MIC pursuant to its master lease agreement with Meyenberg, was merely an attempt to match the maximum annual obligation MIC might incur with respect to interim financing with the annual cash flow to be derived by it from the master lease, and not to state its total obligations with respect to such interim financing. In view of the above, it seems clear that the respondent is in error in his contention that the provisions with respect to the interim financing were impossible to meet. [3]
*139 753 In any event, we think it clear that the provisions with respect to the second due date relating to the deferral of payments of principal and interest by MIC under its note, namely, the date 60 months from the date of the note, or October 1, 1964, would apply regardless of whether interim financing was or could be obtained. Inasmuch as the supplemental provisions unambiguously provided that any payments deferred by MIC should become due and payable upon the earlier of the two dates, the failure to obtain interim financing either because of disinclination or impossibility could not serve to defer MIC's obligations beyond October 1, 1964. Nor was this second due date in any way affected by the further supplemental provisions relating to permanent financing. It is our decision that MIC's note, as modified by the supplemental provisions to the deed of trust which secured it, constituted a fixed and certain obligation. Accordingly, MIC properly included the amount of its note as a cost of the Fifth & Broadway Building for purposes of determining its depreciable basis therein; and properly accrued the interest on the indebtedness represented by such note. The parties have stipulated *140 the proper method and useful life to be used in determining the depreciation deductions allowable. Decisions will be entered under Rule 50. Footnotes
1. A memorandum of the Bank of America with respect to such commitment contemplated that the proceeds therefrom would be used to satisfy the deed of trust in favor of Prudential Life Insurance Company, to retire petitioner's indebtedness to the Union Bank, and to pay from $200,000 to $250,000 on the note which was given to Starrett on the purchase of the Fifth & Broadway Building. Such memorandum further indicated that the proceeds from the master lease between MIC and Meyenberg would be assigned to the bank, that the bank would not require the assignment to it of rentals under Meyenberg's subleases, and that, because of petitioner's financial strength, it would not be necessary for the bank to take a deed of trust on the Fifth & Broadway Building even though petitioner had originally proposed that it do so.↩
2. Pertinent sections of the Internal Revenue Code of 1954 provide in part as follows: SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, except as otherwise provided * * * SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) General Rule. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections * * *), adjusted as provided in section 1016. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. * * * (g) Basis for Depreciation. - The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
3. The supplemental provisions relating to interim financing were to apply only "In the event the Trustor [MIC] obtains an interim loan, * * *." Thus, in view of the fact that MIC deferred payments of principal and interest on its note from the beginning, it would seem that, in fact, the financing obtained by MIC at the Bank of America with respect to the purchase of the Fifth & Broadway Building was accepted by the parties as the interim financing contemplated by the supplemental provisions. While the Bank of America financing did not precisely conform to the conditions set out in the supplemental provisions, the reasons for any variation are apparent from the Bank of America memorandum with regard to such financing.↩